L. R. SMITH, INTERPLEADER, v. GEORGE MYERS ET AL.

In the Springfield Court of Appeals. Opinion filed January 7, 1927.

1.—**Fines—Proceeding under Statute Authorizing Payment of Part of Fine to Informer—Is Equity Proceeding.** Proceeding under section 5619, Revised Statutes 1919, authorizing portion of fine for dynamiting river, in violation of section 5616, to be paid to informer or prosecutor is not at law but in equity, and on appeal is tried de novo on its merits.

2.—**Appeal and Error—Appellate Practice—Equity Case.** On appeal an equity case is tried de novo on its merits.

3.—**Fines—Proceeding under Statute Authorizing Payment of Part of Fine to Informer—Claimant Entitled to Recover, Although He Refused to Sign Complaint.** Claimant held to be informer and he, rather than prosecuting attorney, is entitled to recover, under section 5619, Revised Statutes 1919, authorizing portion of fine for dynamiting river to be paid to informer, though claimant refused to sign complaint.

4.—**Same—Same—Evidence Held Not to Show That Claimant Forfeited Right to Share in Fine.** Evidence that informer carried dynamiter in his car held not to show attempt to aid him in escape, thus forfeiting right to share in fine as permitted by section 5619, Revised Statutes 1919.

---

*Corpus Juris-Cyc. References: Appeal and Error, 4CJ, p. 726, n. 17; Fines, Forfeitures and Penalties, 25CJ, p. 1168, n. 18 New, 25; Interpleader, 33CJ, p. 419, n. 10.

Appeal from the Circuit Court of McDonald County.—Hon. Chas. L. Henson, Judge.

REVERSED AND REMANDED (*with directions*).

*Leo H. Johnson* for appellant.

*O. R. Puckett* for respondent.

BRADLEY, J.—L. R. Smith, sheriff of McDonald county, had in his possession the sum of $250 for which there were different claimants. He brought the money into court and filed his bill of interpleader wherein he asked that the different claimants be required to interplead to the end that the rightful claimant might lawfully be adjudged entitled to the fund. George Myers, J. T. Pinnell, William Timberlake, Forest Harmon and E. A. Schifferli entered their appearance and filed pleas. Myers interpleaded for the entire fund. Pinnell claimed that the fund was created through the joint action of Timberlake and Harmon and the individual action on his own part, and disclaimed as to one-half of the fund, but asked the court to determine his right to the half disclaimed. Timberlake, Harmon and Schifferli merely prayed that the court determine the rights of the respective claimants. After hearing the evidence the court decreed that the entire fund should go to Pinnell. From this judgment and decree claimant Myers appealed.

The fund came into the hands of the sheriff through the arrest and conviction of one Tony Cassota for using dynamite in Elk river in violation of section 5616, Revised Statutes 1919. Cassota entered a plea of guilty and his punishment was fixed at a fine of $500 which fine was paid. Section 5619, Revised Statutes 1919, provides as follows:

"One-half of all fines collected upon convictions under the provisions of sections 5616 and 5617, inclusive, shall be paid to the informer or prosecutor, and the other half paid into the county school fund, and all officers, their deputies and assistants, required by said sections to aid in their enforcement shall be considered informers and prosecutors in all cases where they shall originate prosecutions for any violations of the provisions of said sections."

Schifferli who ran a hardware store at Noel testified that about nine o'clock of the morning Cassota dynamited the river at Ginger Blue, Myers telephoned him to send Timberlake, a deputy constable, to arrest Cassota; that he went to Harmon's store and got Harmon to bring his (Harmon's) car to his (Schifferli's) store; that he sent Oscar Phillips after Timberlake, the deputy constable.

"When Mr. Timberlake came to my store Harmon had his car ready and I told him to go to Ginger Blue, that Myers told me he would keep Cassota until they got there, and if he wasn't there he would be along the road some where between Ginger Blue and Neosho; that he had been ordered by his boss, Mr. Cunningham, to take the kid to Neosho. Mr. Timberlake asked me who they were going

after and I said, 'Tony Cassota;' I told him that Harmon would take him there. I did not see them any more until along in the afternoon. They said they had got him. Later Myers told me not to mention the fact that he phoned the information to me because he had a very good job, paying him four or five dollars a day and he did not want to lose his job. He said that there was no necessity of letting a Dago or any one else come down there and dynamite Elk River and get the fish. It seemed like the people were afraid to do anything. That the Dago had dynamited the river before, and that he (Myers) had tried to get several to turn him in.

"Mr. Cassota was arrested and paid his fine. We came to Pineville about two weeks later to see Mr. Pinnell about one-half of these fees. At the time we did not know George Myers or anyone else would get any of the fees or fine. When we got to Pineville Mr. Pinnell said he had filed the information and he thought he was entitled to it. Later he told Mr. Timberlake he would let the boys have it and divide it among themselves which way they decided. I never put in any claim for any of the money. I was doing my duty as a man. I run a hardware store and sell sporting goods, including fishing tackle and I do not want them to violate the law."

Schifferli being recalled testified: "Mr. Harmon was there at Noel waiting with his car for Timberlake and I told Harmon to take Timberlake to Ginger Blue to arrest Tony Cassota, who had been dynamiting the river and when Timberlake came down he says, 'Where's him, where's him, where's him.' And I said, 'You get in the car with Harmon and he will take you up there.' I didn't tell Timberlake anything further. Yes, Mr. Myers told me over the phone that Tony Cassota was the fellow that did the dynamiting. I told Harmon that Tony Cassota was the man he would go after and that Mr. Myers would keep him (Tony) there by tightening up his springs and putting in gas and oil; and try to keep him there until they got there."

Timberlake, the deputy constable, testified that Phillips came to his home and told him that he was wanted at Ginger Blue; that they were dynamiting the river up there; that Harmon took him to Ginger Blue and that on arriving there he asked old man Corkins about the dynamiting; that Corkins said he knew, but would rather not have anything to do with it; that he and Harmon then went to a hotel, but did not get satisfactory information there; that at that time Myers was in about thirty yards of the hotel working on his car; that when they came out of the hotel Myers was gone; that as they were leaving the hotel old man Corkins ran down the street to their car and said: "Boys, you follow that green car and you will get your man;" that they followed the green car, which was being driven by Myers,

"I stopped at Anderson in front of George Dobbs there. I told him to phone the Marshall at Neosho to watch out for this green car. We followed on and just this side of Goodman where the wagon road goes under the railroad—just this side of there about the second curve—we run on to Mr. Myers' car. We got close to him and he checked up, and we passed him. We was running forty-five miles an hour. We slowed up and kinda passed him. When we slowed down he passed us again. I thought we was going to have another race, but he didn't go very far until he stopped. We run up to the side of him and he said, 'Tim I ain't got that boy, he got a car to Neosho.' Harmon said, 'You had better search the car.' George got out of his car and went around behind Harmon. I went and looked in George's car and there lay that little gentleman between the two seats with his lap robe over him I said, 'George here is that boy, what are you going to do about it?' I talked rough to him aimed to bring him back with me, but he said he had to go to Joplin and bring back some repairs and I let him go on. I brought the Cassota boy down here and took him before Pinnell. Of course he owned up to it and Pinnell put him in jail and we went on back. When we got back to Ginger, Blue Myers was there; of course he couldn't possibly have went to Joplin and got back by the time we drove over here and back."

Harmon's version is about the same as Timberlake's, except he stated that at the hotel he and Timberlake were informed that Tony Cassota was the one wanted.

Pinnell was prosecuting attorney at the time and gave his connection with the Cassota case as follows:

"On the morning of the arrest of Tony Cassota I was sitting in my office and the door opened and Mr. Timberlake and Forest Harmon brought a young man into the office and I said, 'What have you got Tim?' and he says, 'I have got a fellow for dynamiting the creek,' and I says, 'Who is he?' and he says, 'Tony Cassota,' and I looked up at the boy and I said, 'Are you guilty boy?' and he said 'Yes,' and I asked Tim who knew the facts and he told me that he understood that three or four could testify to the facts over at Ginger Blue, and then he told me that he wanted to get a warrant charging George Myers with helping a fugitive to escape, and I said that I would want to investigate that and he told me the circumstances as he has told them here, and George Myers came to my office, I don't know whether it was that morning or that afternoon or just what time it was, and I asked him if he would file a complaint against Tony Cassota and he said, 'No, I won't file any complaint against him.'" By the court: "Who said that?" The Witness: "George Meyers, and I said, 'We have to have a complaint before we can prosecute him,' and he says, 'I won't file any complaint against him, I couldn't afford to,' and I

said, 'Will you testify against him in case it is tried?' and he says, 'I'll not, I have got too good a job over there,' that is his remark to me, 'than to appear in this case as a witness, and I won't testify at all,' and I filed a complaint and Tony waived his preliminary and then I filed my information in the circuit court against him charging him with this crime. I signed the complaint as an individual. This was necessary because no one else here would file it. I understood the defendant could not be held longer than twenty hours unless some one would file a complaint and that under the statute it became my duty and the sheriff's to release him if nothing was filed against him. Mr. Timberlake was the man that informed me that the creek had been dynamited and that Tony Cassota was the dynamiter."

Myers testified that, at the time, he was working as night watchmen at Ginger Blue on the road gang for Mike Cassota part owner of the Middle West Construction Company and father of Tony Cassota; that he went on duty about seven o'clock; that just before going on duty he saw Tony Cassota dynamiting fish; that his shift ended at seven o'clock next morning; that right after seven o'clock his boss, Cunningham, ordered him to go to Anderson; that he notified the authorities of the dynamiting between eight and nine o'clock.

"On my return from Anderson Mr. Cunningham said he had to have some supplies from Neosho. He told me I had to take Tony to Neosho and bring back some supplies for the steam shovel. I was about a quarter of mile north on the new highway when I talked with Mr. Cunningham. I told him I would go to Neosho in my car. In addition to my duties as night watchman I did other work for the construction company, going after all supplies. As soon as I left Mr. Cunningham, I came to Ginger Blue and telephoned Mr. Schifferli at Noel. At the time I phoned him I did not know I would be entitled to any part of any fine under the statute. I told Mr. Schifferli to get the constable as quick as he could and get him up there. That they were going to make me leave with Tony and I would try and stay there until he got there. After I phoned I fooled about there, put oil and gas in the car and tightened my brakes for probably twenty minutes. Tony came in, in the meantime, and packed his suit case and went out. He had been staying there at the cottage at where I was and from where I telephoned.

"My boss, Cunningham, told me to pick Tony up along the road; that he would be watching for me at the bridge about half or a quarter north of Ginger Blue on the old road. I started probably four or five minutes after Timberlake came to Ginger Blue. I did not talk to Timberlake. Cunningham had just left the house as I went out to my car. If I had told Cunningham I had phoned Schifferli I suppose I would have lost my job. That was what I was afraid of. I waited at the hotel until I knew the constable was on the job. In ad-

dition to phoning Schifferli I stopped where Mr. and Mrs. Corkins were staying, that is the old hotel and told them to tell Mr. Timberlake to follow me as the boy would be with me and that they could catch him somewhere between there and Neosho. As I left Mr. Corkin went on down toward the hotel where Mr. Timberlake and Harmon were. He had to go perhaps two or three hundred yards to the new hotel building to talk to Timberlake. I went on up the old road about a quarter of a mile and picked up Tony and drove on toward Neosho. I did not tell Tony I had informed the officers. He never told me anything except, 'I am going to try to get a train out of Neosho.' I knew what he had done, and the superintendent told me he had to leave. I was probably two miles north of Anderson when I first knew the constable was close to me. I had my first notice when they passed me. I had no speedometer on my car and could not say what speed I was driving, but I was not driving so fast. They passed me and I went on by them again probably 150 yards. They stopped and was standing still and I kept waiting for them to come up and it didn't seem like they was going to come. They pulled out to the right of the road after I passed them. I waved with my hand for them to follow me when I passed them. Forest Harmon told me later that Tim said as I passed them, 'Well he is not in that car, he ain't in there.'

"After I stopped Harmon said to Timberlake, 'He may be in there you had better look.' The boy was sitting in the seat with me till he saw them coming. I don't know whether he knew Timberlake or not. He then got in between the back seat and sat down between the back and front seats. Yes, he had a suitcase. I couldn't say where it was. There was no lap robe there. He had nothing over him. There was nothing in the car. They came up and wanted to know where Tony went and I told them he had come on to Neosho. I wanted them to follow me on to Neosho and not catch him in my car, because I though it would lose me my job. I was trying to satisfy the law and at the same time save my job. I intended if they didn't catch me or follow me to Neosho to turn him over to the officers there, or phone back for them to come and get him."

On Cross-examination Myers testified:

"I told Timberlake and Harmon I was going to Neosho—not to Joplin—after some repairs for the steam shovel. I went to Briggs Hardware store at Neosho. I saw some of the clerks. I got some packing for the shovel and some bushings and repairs for the pump and other stuff for the steam shovel. I didn't tell Timberlake I was going to Joplin. I got back to Ginger Blue after that as soon as I could drive on to Neosho and back to Ginger Blue."

Jay Taylor who was not a claimant testified that he was at the Ginger Blue hotel when Timberlake and Harmon came to the hotel and made inquiry as to who did the dynamiting, and that Paul

Bracken told them that it was Tony Cassota; that Timberlake said, "Where is he?" and that Bracken said that he did not know; that they stood and talked a while and pretty soon Corkins came down and said: "Well, George Myers left here in his car and I'll bet ten dollars to a doughnut you will find Tony in his car."

Respondent Pinnell it would seem from his brief proceeds here on the theory that this cause is one at law and that we are bound by the finding below unless it appears that there is no substantial evidence to support that finding. This cause, however, is in equity. [Taylor v. Perkins, 171 Mo. App. 246, 157 S. W. 122.] On appeal an equity case is tried *de nova* on its merits. [Price v. Morrison, 291 Mo. 249, 236 S. W. 297.] Our research does not disclose that section 5619, Revised Statutes 1919, which authorizes a portion of the fine therein mentioned to be paid to an informer or prosecutor, has been construed by an appellate court, although such section or similar ones have been in the statute for many years. We do not deem it necessary to enter upon a consideration of the propriety and the right of a prosecuting attorney to participate in a fund derived under circumstances like those here. We considered to some extent the pay and emoluments of a prosecuting attorney in Aldridge v. Zorn, 287 S. W. 650.

We are convinced from this record that claimant Myers was the informer in the Cassota case. There is no escape from this conclusion, and there is no escape from the conclusion that he is entitled to the fund unless he forfeited his right thereto by attempting to aid Cassota to escape. His conduct should be considered, however, in the light of the circumstances which he was in and which affected him. As soon as he was off duty he telephoned to Schifferli and thereby caused the deputy constable to go in quest of the dynamiter. He says that he advised Schifferli who had been dynamiting, and Schifferli says that he was so advised. He also told Schifferli that he, Myers, would try to keep Cassota at Ginger Blue until the officers arrived; that he would do this by delay in "tightening up his springs and putting in gas and oil." And when Timberlake and Harmon arrived at Ginger Blue, Myers was there working about his car. When he left he told Corkins, according to his evidence, to tell Timberlake to follow his car. He is here corroborated most strongly in the fact that immediately after he left Ginger, Blue Corkins told Timberlake to follow the green car. Myers' conduct, even as given by Harmon and Timberlake, when they overtook him does not wholly discredit his version.

Myers did all that was done towards informing the officers of the transgression of the law. Pinnell did no more than his duty as prosecuting attorney. It is true that Myers refused to sign a complaint, but the statute, section 5619, does not require that the informer make the complaint upon which to base a warrant. We think

.that Myers did just what he said that he did, viz.; that he was trying to satisfy the law and at the same time save his job.

The judgment should be reversed and the cause remanded with directions to the trial court to enter judgment for Myers for the fund brought into court by the sheriff less the costs incurred in the trial court and the fee allowed interpleader Smith's attorney. It is so ordered. *Cox, P. J.,* and *Bailey, J.,* concur.